# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

**ROBERT LEE MARTIN,**

        **Petitioner,**

**-vs-**
                             **Case No.  A-08-CA-732-SS**

**RICK THALER,**

        **Respondent.**

---

# O R D E R

BE IT REMEMBERED on this day the Court reviewed the file in the above-styled cause, and specifically Petitioner Robert Lee Martin ("Petitioner")'s Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2254 [#1], his memorandum and authorities in support thereof [#3]; Respondent Rick Thaler[1] ("Respondent")'s answer with brief in support [#24], and Petitioner's response thereto [#26]; the Report and Recommendation of the Magistrate Judge [#27], and Petitioner's objections thereto [#29].  Plaintiff, proceeding pro se, has been granted leave to proceed in forma pauperis.  *See* Order [#5].  Having considered the aforementioned documents, the case file as a whole, and the applicable law, the Court enters the following opinion and orders.

All matters in this case were referred to the Honorable Robert Pitman, United States Magistrate Judge, for report and recommendation pursuant to 28 U.S.C. §636(b) and Rule 1(e) of Appendix C of the Local Court Rules of the United States District Court for the Western District of

---

[1]The previous named respondent in this action was Nathaniel Quarterman.  Rick Thaler succeeded Nathaniel Quarterman as Director of the Texas Department of Criminal Justice, Correctional Institutions Division ("TDCJ-CID") on July 15, 2009.  Under Rule 25(d)(1) of the Federal Rules of Civil Procedure, Thaler is therefore automatically substituted as a party.

Texas, Local Rules for the Assignment of Duties to United States Magistrate Judges, as amended, effective December 1, 2002. On August 8, 2009, the Magistrate Judge issued his report and recommendation that Petitioner's petition for writ of habeas corpus be denied. Petitioner timely filed written objections to the Magistrate's report and recommendation on August 21, 2009, and thus the Court reviews the Magistrate Judge's report and recommendation de novo. 28 U.S.C. § 636(b)(1) ("A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made."). Having reviewed the petition, the report and recommendation, the objections, the applicable law, and the case file as a whole, the Court ACCEPTS the Magistrate Judge's report and recommendation.

## BACKGROUND

Petitioner does not object to the background facts set forth in the Report and Recommendation of the Magistrate Judge, although he does seek to supplement those facts with additional ones. Thus, the Court adopts the background facts as related in the Report and Recommendation (and sets them forth below for ease of reference), adding the additional facts as requested by Petitioner where appropriate.

## I.    Procedural History

According to Respondent, the Director has lawful and valid custody of Petitioner pursuant to a judgment and sentence of the 331st Judicial District Court of Travis County, Texas, in cause number 955530, styled *The State of Texas v. Robert Lee Martin*. Petitioner was charged with aggravated sexual assault with a deadly weapon. After a jury trial, Petitioner was found guilty as charged, and on June 7, 2001, the jury assessed a life sentence and a $10,000.00 fine. Petitioner filed a timely motion for new trial, which was denied by operation of law. Tr. at 68, 84.

On December 6, 2001, Petitioner, with the assistance of counsel, filed his first state application for habeas corpus relief, seeking an out-of-time appeal, which was granted. *Ex parte Martin*, Appl. No. 51,510-01. Petitioner's conviction was subsequently affirmed on direct appeal. *Martin v. State*, No. 03-02-00435-CR, 2003 WL 21087732 (Tex. App.–Austin 2003, pet. ref'd).

On August 10, 2006, Petitioner filed a second state application for habeas corpus relief, alleging he was denied the right to file a petition for discretionary review. *Ex parte Martin*, Appl. No. 51,510-03. On June 13, 2007, the Texas Court of Criminal Appeals granted Petitioner relief, permitting him to file an out-of-time petition for discretionary review. The Court of Criminal Appeals refused the petition for discretionary review on November 14, 2007. *Martin v. State*, PD 1068-07.

On June 10, 2007, Petitioner filed an additional application for habeas corpus relief. *Ex parte Martin*, Appl. No. 51,510-05. It was dismissed on October 3, 2007, because his direct appeal was pending. Petitioner filed his fourth state application for habeas corpus relief on February 28, 2008. *Ex parte Martin*, Appl. No. 51,510-06. The Texas Court of Criminal Appeals denied the application without written order on the findings of the trial court without a hearing.

## II.    Factual Background

The complainant, Cherry Ann Nash, testified that she lived in a rented room at a recovery house and worked for a temporary agency called Pacesetter on the day of the rape. 3 RR 15-17. Nash admitted to using cocaine on several occasions, but not on the day of the offense.[2] 3 RR 17. Nash testified that she got off work about 5:30 or 6:00 p.m. and while sitting on the corner of

---

[2]In his objections to the Report and Recommendation, Petitioner claims that although Nash admitted to using cocaine "on several occasions," she was in fact a drug addict. Pet.'s Objs.[#29] at 4. Nash implied she was a former drug addict in her direct testimony. *See* 3 RR 17.

Rosewood, Martin approached her. 3 RR 17-19. Nash and Martin began walking together when Martin then offered her crack cocaine. 3 RR 19-23. Subsequently, she voluntarily accompanied him to a safe place to smoke the crack. *Id.* Nash described the route she and Martin took through Rosewood Park, by some railroad tracks. 3 RR 23-24. She agreed to go near some bushes, however, she got scared when Martin grabbed her for refusing to go further into the bushes. 3 RR 24-26. Martin began choking Nash until her eyes rolled back into her head. 3 RR 26. Martin then pushed her into the bushes behind the trees next to the railroad track and wielded a knife. 3 RR 27. Martin told her she would not be harmed if she did as he said. 3 RR 27. Nash described the sexual assault wherein Martin forced her to take off her clothes, to perform oral sex on him, Martin also performed oral sex on her, and then placed his penis inside her vagina. 3 RR 27-29. Nash testified that Martin was able to sexually assault her, because he had a knife and she was afraid for her life as Martin threatened to kill her. 3 RR 29. Following the assault, Martin released her and she returned home around 10:00 p.m. 3 RR 29-30. Nash did not shower or sleep that night. 3 RR 30.

The next morning, Nash advised her co-workers that she had been raped, and one co-worker drew a picture of Martin based on Nash's recollections. 3 RR 30-31; State's Ex. No. 2. Taking the drawing to the police, Nash reported the rape. 3 RR 31-32. Nash then went to St. David's Hospital for a sexual assault exam. 3 RR 32-33. Two weeks later, Nash gave a formal written statement to police and identified Martin in a photo line-up and in the courtroom. 3 RR 33-34, 36; photo entered as State's Ex. No. 3.

On cross examination, Nash admitted to serving time in prison for theft.[3] 3 RR 40-41. Nash

---

[3]In his objections to the Report and Recommendation, the Petitioner asserts the background section should contain the criminal history of Nash. *See* Pet.'s Objs. at 3. Petitioner claims Nash's criminal history includes (1) failure to ID - fictitious name; (2) theft class B over $200; (3) theft by appropriation; and (4) theft. *Id.* He also claims she "used

testified that, from the assault, she suffered bruising around her neck and was given medication for an infection. 3 RR 56-57. Nash said she could scream only once before Martin choked her but could not scream after being choked.[4] 3 RR 57-59. Nash never took the police to the location of the assault and admitted she does not know the name of the coworker who drew Martin's picture. 3 RR 60-61.

On re-direct, Nash testified she did not know what hand Martin used or how long the knife was because she just wanted to live and feared for her life. 3 RR 62-63. On re-cross, Nash was uncertain of the time she returned home after the assault, however, she stated that the doors to the recovery home were still open. 3 RR 63-64. Nash did not recall whether police asked for either the towel she use to wipe herself with after the assault or the clothes she wore during the assault. 3 RR 64-65.

Austin Police Department Officer Charles Johnson testified that at the time of the offense, he was supervisor of detectives who worked on sexual assault reports involving adult victims. 3 RR 68. Upon meeting Nash, Officer Johnson described her as being very upset, crying and traumatized. 3 RR 69. Officer Johnson began to recount details of what Nash told him regarding the assault, however the defense objected to this line of questioning as hearsay. 3 RR 69-70. The trial court overruled the objection under the hearsay exception of excited utterance. 3 RR 70. The court then

---

9 or more alias names and alias date of births." *Id*.

[4]Petitioner asserts Nash "in fact stated at trial that she could see people in the park and hear there [sic] voices yet when she scream [sic] out loudly as she alleged no one heard her." Pet.'s Objs. at 4 (emphasis in original).

advised the State to lay the predicate for Nash's mental state since her police interview took place the day after the assault. 3 RR 70. Officer Johnson restated Nash's mental state as she was very upset and crying. 3 RR 70-71. Consequently, the trial court allowed the State to question Officer Johnson with what Nash told him regarding the assault. 3 RR 70. Officer Johnson testified to similar details of Nash's previous testimony. 3 RR 71-72. Nash advised Officer Johnson that Martin had ejaculated into her, she had not showered, and she had only wiped the area so she would not disturb the evidence. 3 RR 72. Johnson testified that Nash's clothing worn during the assault was brought to the police on July 12, 1995. 3 RR 73. Johnson identified State's Exhibit No. 4 as the bag containing Nash's clothes. 3 RR 74. Johnson stated that Teo Leal, the Victim Services Counselor, helped Nash retrieve her clothing and drove her to the hospital for the rape exam. 3 RR 74. Officer Johnson confirmed that State's Exhibit No. 2 was Nash's drawing turned over to him. 3 RR 75. Johnson again spoke to Nash when she arrived at the police station to give a written statement and look at a photo line-up wherein she identified Martin's picture as the assailant. 3 RR 76. Officer Johnson confirmed State's Exhibit No. 3 as the photo of Martin chosen by Nash. 3 RR 76-77.

On cross examination, Officer Johnson agreed Rosewood Park was surrounded by housing projects where crack cocaine is used and that no photographs were taken of the area where the sexual assault took place. 3 RR 81. Johnson did not recall seeing injuries sustained by Nash. 3 RR 81. On re-direct, Johnson did not recall telling another detective that he noted injuries on Nash. 3 RR 81-82. On re-cross, Officer Johnson testified that he believed there was mud, dirt and grass stains

on Nash's clothing. 3 RR 84-84-85. Johnson had no special knowledge regarding the addictive nature of crack cocaine.[5] 3 RR 85-86.

Lori Lord, an experienced sexual assault nurse examiner ("SANE"), examined Nash on July 12, 1995, the day after the assault. 3 RR 89-90, 96. Lord testified that the information received from Nash was used for pain and medical treatment because Nash complained of an injury to her throat. 3 RR 96-97. The defense objected to the State's questioning of Lord regarding the details of the sexual assault under Texas Rule of Evidence 803(4). 3 RR 97-98. During defense's voir dire examination, Lord stated that the information she receives from a victim could be used for medical treatment and for criminal prosecution. 3 RR 99. Lord clarified that at the time of a SANE examination, her sole purpose is to use information to determine what kind of medical treatment is required, and that it would be up to some other individual to determine if that same information would later be used in a criminal proceeding. 3 RR 99-100. The trial court overruled the objection. 3 RR 100. Lord recounted the details of the sexual assault as provided to her by Nash. 3 RR 100. Lord testified that Nash had bruising on her left arm, superficial scratches on her neck, and throat pain which made it difficult to swallow. 3 RR 101-103. Lord did not note any injuries to Nash's vaginal area. 3 RR 103-104. Lord testified that fluid removed from Nash's vagina indicated spermatozoa, but slides from oral swabs were negative for sperm. 3 RR 103. Lord identified State's Exhibit No. 5 as Nash's rape kit which included the swabs, slides, three tubes of blood, and combing from pubic hair. 3 RR 105-107.

On cross examination, Lord stated that while she detected bruises on Nash's left arm, she

---

[5]Petitioner points out "the investigating officers did not take pictures of [Nash] which in a case such as this is normally done by investigating officers." Pet.'s Objs. at 4.

found none around her neck. 3 RR 107-109. Lord did not believe the lacerations on Nash's neck were the result of going through bushes and did not note any infection to Nash's neck. 3 RR 109. Lord did not know if Nash was given medication for an infection. 3 RR 109. Lord did not recall Nash telling her that Martin tried to strangle her, however, because the offense happened so many years ago, Lord did not remember talking to Nash. 3 RR 109. Lord did not take pictures of Nash, and that is something not normally done by her but by the investigating officers. 3 RR 111. Lord also did not take the clothes Nash was wearing at the time of the assault. 3 RR 111. On re-direct examination and reading from her triage notes, Lord stated that Nash told her she was choked. 3 RR 113. On re-cross, Lord's notes indicated that Nash was calm, alert and oriented, but testified that it was not uncommon for rape victims to hold themselves together emotionally during an exam. 3 RR 113-114.

Karen Alexander, a sergeant with the Austin Police Department assigned to Sex Crimes Detail, testified that she prepared the photo line-up for Nash's review and Martin was in the fourth position. 3 RR 115-118. Nash was originally supposed to contact the police on July 13, 1995, yet failed to do so. 3 RR 119. Alexander scheduled an appointment for July 19, 1995, so Nash could review the photo line-up, but she failed to keep it. *Id.* Nash, however, reviewed the photo line-up on July 25, 1995, in the presence of another police officer as Alexander was not in the office. 3 RR 119-120. Alexander received the clothes Nash was wearing at the time of the assault from Commander Johnson on July 13, 1995, and sent it along with the rape kit to DPS for testing on July 20, 1995. 3 RR 120-21. Consequently, Alexander prepared an arrest warrant for Martin and issued a "be on the lookout" for Martin on August 2, 1995. 3 RR 121-122.

On cross-examination, Alexander testified that Nash gave her no explanation of why she failed to keep her appointment dates. 3 RR 124. Alexander did not recall what tests were requested on the items she sent to DPS nor did she recall if the police ever request blood tests to determine the presence of cocaine or alcohol. 3 RR 125-26. On re-direct, the defense objected to the State's question regarding Alexander's recollection of a conversation she had with Commander Johnson where he stated his initial observations of Nash. 3 RR 126. The trial court sustained the objection based on hearsay, and consequently, instructed the jury to disregard Alexander's response. 3 RR 126-127.

Irma Rios, supervisor of the DNA section of the Austin DPS crime lab, testified that Nash's rape kit and Martin's samples were submitted to the DNA lab and analyzed using tests not as specific as those available at the time of trial. 3 RR 147-48, 150-151, respectively. Rios testified that sperm on Nash's vaginal swabs was consistent with Martin's DNA. 3 RR 152.

On cross examination, Rios stated that the DNA testing occurred on February 13-14, 1995, but the lab did not use all the samples. 3 RR 154. Rios confirmed that the lab still had the samples and no request was made to test the samples to determine blood and/or alcohol content. 3 RR 155-156. Rios admitted that she was not a toxicologist and did not know how long it would take toxicology to test the samples. 3 RR 157-59. Following this line of questioning, the State objected since Rios already testified she was not a toxicologist. 3 RR 159. The trial court sustained the objection. *Id.* Rios testified that vaginal swabs were tested and the results were similar to those of Martin. 3 RR 159-60. The tests were performed by Wilson Young and Michelle Locke, and Rios reviewed the results on four separate occasions prior to trial. 3 RR 160. The defense objected to the State's line of questioning on what Rios's personnel reported finding on Nash's clothing. 3 RR

163.  The trial court sustained the objection as hearsay.  *Id.*  The State and defense rested.  3 RR

164.  Subsequently, after closing arguments, the jury found Martin guilty of aggravated sexual

assault.  5 RR 4.

During punishment, Nadine Garcia testified that she was raped by Martin on March 5, 1995.

5 RR 8.  Garcia stated that Martin approached her asking she wanted to smoke crack cocaine, he

then pulled a knife when she said no.  5 RR 9-10.  Martin choked her into unconsciousness, and

when she later awoke she found herself in an ant bed with her pants down below her legs.  5 RR

11-12.  Garcia went to St. David's Hospital for a sexual assault examination and identified Martin

as her assailant.  5 RR 15.  Clarence Darrell Jamail, a patrol officer with the City of Austin,

corroborated Garcia's testimony, stating Garcia was hysterical, hyperventilating, had leaves and dirt

in her hair and clothes, and had red marks around her face and throat.  5 RR 21-23.  Kathleen

Thompson, a sexual assault nurse examiner, performed a SANE examination on Garcia and took

a statement from her at St. David's Hospital further corroborating Garcia's testimony.  5 RR 30-35.

Next, Paula Williams testified that she was grabbed, choked and raped by Martin on April

26, 1995. 5 RR 45-46.  Williams stated that after she regained consciousness, she went to her

godsister's house who called for an ambulance.  5 RR 46.  A SANE examination was performed

on Williams at the hospital.  5 RR 46.  Officer Donald Craig Baker with the City of Austin

corroborated Williams's testimony.  5 RR 52-60.  Kathleen Thompson, who performed a SANE

examination, also corroborated Williams's testimony.  5 RR 62-64.

Officer Oswaldo Sotolongo next testified that he was dispatched to investigate the sexual

assault of Terry Thompson.  5 RR 104-106.  Officer Sotolongo stated that Thompson said the

sexual assault occurred near the railroad tracks.  5 RR 107.  A SANE examine was performed on

Thompson at St. David's hospital which was later submitted it to the police. 5 RR 112-114. On cross examination, Sotolongo testified that Thompson agreed to have oral sex with Martin in exchange for crack cocaine and that no weapon was used in the assault. 5 RR 115-117. On re-direct, Officer Sotolongo stated that once Thompson agreed to have oral sex with Martin, she became uncomfortable and tried to flee. 5 RR 117. However, when Thompson attempted to leave, Martin grabbed her by the throat and forced her into a wooded area. *Id.* Nurse Kathleen Clavey, who performed the SANE exam on Thompson, corroborated Officer Sotolongo's testimony. 5 RR 119-126.

Next, Annie Lee Thomas testified that Martin attempted to abduct and rape her in August 1995. 5 RR 128-134. Thomas stated that Martin choked her until she pretended to faint, then found Martin's knife and tried to stab him. 5 RR 134 135. Martin began hitting her in the head with rocks and Thomas bit him. 5 RR 135-136. Martin tried to force her into the woods with him, but she resisted. 5 RR 136-137. Thomas attempted to stab Martin again, then they were on their feet, but Martin decided to let her go realizing she was getting the best of him. 5 RR 138-39. Thomas was transported to Brackenridge Hospital and later identified Martin in a photo line-up. 5 RR 140-144. Officer Jeffrey D. Hampton investigated the attempted sexual assault on Thomas and corroborated Thomas's testimony. 6 RR 5-18.

Another of Martin's victims, Terry Janelle Thompson, testified that she agreed to have oral sex with Martin in exchange for crack cocaine. 6 RR 22-24. However, when Thompson refused to accompany Martin into a wooded area, he choked her then sexually assaulted her. 6 RR 25-29. Thompson later identified Martin from a police photo line-up. 6 RR 30-31.

Finally, DPS crime lab supervisor Irma Rios testified that sperm samples taken from Nadine Garcia and Terry Thompson confirmed that Martin was the source of the sperm. 6 RR 46-50. After the presentation of argument, the jury sentenced Martin to life imprisonment and a $10,000.00 fine. 6 RR 74.

<h3 align="center">PETITIONER'S GROUNDS FOR RELIEF</h3>

Petitioner raises multiple grounds for relief:[6]

1.  The trial court erred in: (a) failing to instruct the jury on the lesser included offense (claim one); (b) admitting hearsay statements to the nurse not made under the medical diagnosis rule (claim five); (c) admitting testimony of DNA lab results through the DPS crime lab supervisor in violation of hearsay (claim two); (d) admitting hearsay of the victim as an excited utterance (claim four); and (e) admitting inadmissible extraneous offense evidence (claim eight);

2.  The State erroneously: (a) commented on his failure to testify and his right to remain silent during closing argument (claim three); (b) admitted hearsay during closing argument that complainant's account of events was corroborated by police testimony, thus bolstering the witness (claim four); (c) argued outside the record during punishment (claim seven); (d) solicited inadmissible character evidence (claim six); (e) introduced inadmissible extraneous offense evidence (claim eight); and (f) offered testimony of DNA lab results through the DPS crime lab supervisor in violation of hearsay (claim two);

---

[6]As did the Magistrate Judge, the Court finds it difficult to determine in some instances whether Petitioner is basing a claim on trial court error or prosecutorial misconduct; in such instances, the Court analyzes the claim under both standards.

3.  He received ineffective assistance of counsel on appeal because counsel filed an *Anders* brief (claim nine);

4.  On state writ, the trial court abused its discretion in entering findings of fact and conclusions of law and failing to rule on his motion for an evidentiary hearing (claim ten); and

5.  The appellate counsel who filed the *Anders* brief was never appointed to represent him pursuant to Texas Code of Criminal Procedure art. 26.04 (amended application).

## ANALYSIS

### I.     Failure to Exhaust

On April 27, 2009, Petitioner amended his habeas petition to add an additional argument regarding the ineffectiveness of his appellate counsel.  *See* Amend. to Pet. [#23]; *supra* Ground 5. He claims Mary Kay Sicola, the appellate counsel who filed the *Anders* brief, was never appointed to represent him pursuant to Texas Code of Criminal Procedure art. 26.04.  *Id.*  Although a lawyer (Elaine  Fannin) ***was*** appointed to represent him on appeal, he claims Ms. Sicola, not Ms. Fannin, was the lawyer who filed an *Anders* brief.  Pl.'s Objs. at 6.  Because Ms. Sicola was allegedly never appointed "in accordance with the mandatory provisions of Texas Code of Criminal Procedure Art. 26.04," nor authorized by order of the state court, he objects to her apparent "representation" of him on appeal.  Amend. to Pet. at 3.

It is undisputed Petitioner has never presented this claim to the state courts.   Furthermore, a subsequent application for habeas relief on this unexhausted issue would be futile, as it would be

dismissed pursuant to TEX. CODE CRIM. PROC. art 11.07, § 4 as an abuse of the writ.[7] In *Coleman v. Thompson*, the Supreme Court held when a state court judgment rests on a state law ground that is independent of a federal question and adequate to support the judgment, federal courts lack jurisdiction to review the merits of the case. 501 U.S. 722, 729 (1991). This applies even when the independent and adequate state ground supporting a habeas petitioner's custody is a state procedural default, as a "habeas petitioner who has failed to meet the State's procedural requirements for presenting his federal claims has deprived the state courts of an opportunity to address those claims in the first instance." *Id.* at 731-32. Furthermore, even where the state court did not explicitly apply a procedural bar to a claim (because it was not presented to the court), federal review is nevertheless precluded if the petitioner failed to exhaust state remedies and "the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred." *Id.* at 735, n.1. "In such a case there is a procedural default for purposes of federal habeas regardless of the decision of the last state court to which the petitioner actually presented his claims." *Id.* However, a petitioner can still obtain federal habeas review on a claim denied by the state court on the grounds of procedural default if he can show "cause" and "actual prejudice" for his procedural default or that a failure to address the merits of the federal

---

[7]Section 4 provides that if a subsequent application for writ of habeas corpus is filed after final disposition of an initial application challenging the same conviction, a court may not consider the merits of or grant relief based on the subsequent application unless the application contains sufficient specific facts establishing: (1) "the current claims and issues have not been and could not have been presented previously...because the factual or legal basis for the claim was unavailable on the date the applicant filed the previous application;" or (2) "by a preponderance of the evidence, but for a violation of the United States Constitution no rational juror could have found the applicant guilty beyond a reasonable doubt." TEX. CODE CRIM. PROC. art 11.07, § 4. The statute specifies that the factual basis can only be considered to have been unavailable "if the factual basis was not ascertainable through the exercise of reasonable diligence on or before th[e] date" in question. *Id.*

claim would result in a miscarriage of justice. *Moore v. Roberts*, 83 F.3d 699, 702 (5th Cir. 1996)

(citing *Coleman*, 501 U.S. at 750).

Petitioner has failed to show cause and actual prejudice for his procedural default, nor has

he shown a failure to address the merits of his federal claim would result in a miscarriage of justice.

Although he makes one assertion to this end in his objections to the Report and Recommendation,

*see* Pet.'s Objs. at 7 ("Petitioner argue [sic] actual prejudice and states that failure to address the

merits of the federal claim would result in a miscarriage of justice."), he presents absolutely no

support for this single conclusory statement. Courts "are not bound to accept as true a legal

conclusion couched as a factual allegation." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009). Thus,

the Court finds Petitioner is barred from raising this unexhausted claim.

## II.     Procedural Default

Although Respondent argues Petitioner's claims of trial court error and prosecutorial

misconduct are procedurally defaulted for failure to raise those claims in his direct appeal, the

Magistrate Judge found the state court did not expressly and unambiguously deny relief based on

a state procedural default. Having reviewed the record, the Court agrees and finds Petitioner's

claims on these grounds are not defaulted and should be considered on the merits.

## III.    Legal Standards under the Antiterrorism and Effective Death Penalty Act of 1996

On April 24, 1996, the President signed into law the Antiterrorism and Effective Death

Penalty Act of 1996 ("AEDPA"). Pub. L. No. 104-132, 110 Stat. 1214 (1996). AEDPA proscribes

federal habeas relief unless the state court's adjudication on the merits (1) "resulted in a decision

that was contrary to, or involved an unreasonable application of, clearly established federal law, as

determined by the Supreme Court of the United States" or (2) "resulted in a decision that was based

upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d); *Burton v. Terrell*, 576 F.3d 268, 272-73 (5th Cir. 2009). Additionally, AEDPA requires courts to "presume state court findings of fact to be correct unless the petitioner rebuts that presumption by clear and convincing evidence." *Burton*, 576 F.3d at 273 (citing 28 U.S.C. § 254(e)(1)).

The Supreme Court has "made clear that the 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of petitioner's case." *Richards v. Quarterman*, 566 F.3d 553, 561 (5th Cir. 2009 (citing *Wiggins v. Smith*, 539 U.S. 510, 520 (2003)). But "[t]he question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Id.* (citing *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). The Fifth Circuit has held that, because a federal habeas court only reviews the reasonableness of the state court's ultimate decision, the AEDPA inquiry is not altered when state habeas relief is denied without an opinion. *Schaetzle v. Cockrell*, 343 F.3d 440, 443 (5th Cir. 2003) (citing *Santellan v. Cockrell*, 271 F.3d 190, 193 (5th Cir. 2001), cert. denied, 535 U.S. 982, 122 S. Ct. 1463 (2002); *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002) (en banc) ("It seems clear to us that a federal habeas court is authorized by § 2254(d) to review only a state court's 'decision,' and not the written opinion explaining that decision."), cert. denied, 537 U.S. 1104, 123 S. Ct. 963 (2003)). With these principles in mind, this Court now turns to the issues raised by the pleadings in this case.

## IV.    Discussion

### a.    Trial Court Error

As noted above, Petitioner argues the trial court erred in (a) failing to instruct the jury on the lesser included offense of assault (claim one); (b) admitting hearsay statements to the nurse not made under the medical diagnosis rule (claim five); (c) admitting testimony of DNA lab results through the DPS crime lab supervisor in violation of hearsay (claim two); (d) admitting hearsay of the victim as an excited utterance (claim four); and (e) admitting inadmissible extraneous offense evidence (claim eight).

The Court notes that in conducting habeas review of the state trial proceedings, the Court is limited to deciding "whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).  In other words, "Before a federal court may overturn a conviction resulting from a state trial...it must be established not merely that the [State's action] is undesirable, erroneous, or even 'universally condemned,' but that it violated some right which was guaranteed to the defendant by the Fourteenth Amendment." *Smith v. Phillips*, 455 U.S. 209, 221 (1982).  Thus, the federal courts do not sit to review questions of compliance with state procedural rules—these are questions of state law only and are not cognizable in a federal habeas corpus proceeding. *Smith v. McCotter*, 786 F.2d 697, 702-03 (5th Cir. 1986).  And even if the trial court erred, the trial error must have had a substantial or injurious effect or influence on the verdict, so that there is "more than a mere reasonable possibility that it contributed to the verdict." *Mayabb v. Johnson*, 168 F.3d 863, 868 (5th Cir. 1999) (citing *Brecht v. Abrahamson*, 507 U.S. 619-637-38 (1993).

**(1) Lesser Included Offense**

Petitioner claims the trial court should have instructed the jury on the lesser included offense of assault, or sexual assault without a deadly weapon. *See* Pet.'s Memo. at Claim 1. But in a non-capital state trial, the failure to give an instruction on a lesser included offense does not raise a federal constitutional issue. *Valles v. Lynaugh*, 835 F.2d 126, 127 (5th Cir. 1988) (citing *Alexander v. McCotter*, 775 F.2d 595 (5th Cir. 1985)). Thus, the trial court's failure to give an instruction on a lesser included offense, even if it was error, does not warrant federal habeas relief.

**(2) Nurse Lord's Testimony**

Petitioner claims the admission of hearsay statements through the testimony of Nurse Lori Lord, the SANE nurse, violated Texas Rule of Evidence 803(4). It is well-settled a state trial court's evidentiary rulings will mandate habeas relief only "when errors are so extreme that they constitute a denial of fundamental fairness." *Little v. Johnson*, 162 F.3d 855, 862 (5th Cir. 1998) (citing *Evans v. Thigpen*, 809 F.2d 239, 242 (5th Cir.1987)). Habeas relief is not warranted unless the wrongfully admitted evidence "played a crucial, critical, and highly significant role in the trial." *Id.* (citing *Andrade v. McCotter*, 805 F.2d 1190, 1193 (5th Cir. 1986)).

Texas Rule of Evidence 803(4) makes an exception to the hearsay rule for statements "made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment." At trial, the court overruled defense counsel's hearsay objection to Lord's testimony because Lord testified the statements were taken and reported by her for the purpose of medical treatment. 3 RR 97-100. Lord testified at the time of a SANE examination her sole purpose is to gather information to determine what kind of

medical treatment is required. 3 RR 99-100. Once the trial court overruled the objection, Lord proceeded to recount the details of the sexual assault as provided to her by Nash. 3 RR 100. Specifically, Petitioner takes issue with Lord's testimony that Nash told her Petitioner was wielding a knife during the incident.

Texas appellate court have consistently affirmed that a nurse's testimony may satisfy the Rule 803(4) exception. *In re M.M.L.*, 241 S.W.3d 546, 553 (Tex.App.–Amarillo 2006, pet. denied) (surveying cases permitting nurses to testify about statements made by the victim during an exam); *Taylor v. State*, 268 S.W.3d 571 (Tex. Crim App. 2008). Texas appellate courts have also held "[t]he purpose of a sexual assault examination is to determine whether the complainant has been sexually assaulted and to assess whether medical attention is required;" therefore, "statements during the examination that describe the sexual assault are pertinent to medical diagnosis and treatment" and are not hearsay. *Shackelford v. State*, 2009 WL 508478 at *3 (Tex. App.–Houston [14th Dist.] 2009) (citing *Beheler v. State*, 3 S.W.3d 182, 189 (Tex.App.–Fort Worth 1999, pet. ref'd)). Therefore, Petitioner has failed to demonstrate admission of Lord's testimony was erroneous, as it appears from the record Nash's statements made to Lord were made for purposes of medical diagnosis or treatment and described "the inception or general character of the cause or external source" of her injuries in way reasonably pertinent to the diagnosis or treatment. The trial court's ruling was not erroneous.

Furthermore, even if the admission of Lord's testimony was erroneous (a conclusion the Court rejects), erroneously admitted evidence mandates habeas relief only if the error is so extreme it constitutes a denial of "fundamental fairness." *See Little*, 162 F.3d at 862. Although Petitioner claims Lord's testimony about Nash's account of a knife "played a crucial factor" in the trial

because it was the subject of a jury question,[8] Nash herself testified repeatedly that Petitioner wielded a knife during the assault. *See* 3 RR 27; 62-63. Thus, Lord's testimony that Nash told her Petitioner had a knife was not highly significant, as it was cumulative of Nash's own testimony; in other words, the jury had already heard Nash say this for herself repeatedly, without objection. *See Reyes v. State*, 84 S.W.3d 633, 638 (Tex. Crim. App. 2002) (finding any error in admission of evidence is harmless if it is cumulative of evidence properly admitted elsewhere). In short, the admission of Lord's testimony was not erroneous, and—even if it could be considered erroneous—was harmless.

### (3) DNA Lab Results

Petitioner also contends the trial court violated his Sixth Amendment right to confront witnesses against him when the DNA lab test results were admitted through the testimony of the DPS crime lab supervisor, Irma Rios, who did not perform the tests. Pet.'s Memo. at Claim 2. He claims the reports of the "absent forensic chemist" were not admissible and constituted hearsay. *Id.* at 5-6.

However, the underlying chemist's report was not introduced into evidence. Instead, Rios testified as an expert witness and gave her expert opinion as to the results of the DNA testing. *See* 3 RR 147-63. Rios testified as to her educational and professional background, and as to the fact that she supervises ten analysts. 3 RR 147-48. She stated she had previously testified as an expert on DNA testing and analysis approximately 50 to 70 times. 3 RR 148. She described the type of

---

[8]Specifically, the only jury question was as follows: "Judge Perkins, We are in dispute as to whether a knife was exhibited or used in the sexual assault of Cherry Nash. We would like part of the SANE nurse's testimony read back to us. The area we are concerned with has to do with Ms. Nash's account of her sexual assault to the nurse, specifically any mention of a knife." 1 RR 054.

testing what would have been done on the samples submitted in this case, and that the testing was not as specific in 1995-1996. 3 RR 151. She testified the tests in this case were performed by Wilson Young and Michelle Locke, and Rios reviewed the results—which involves looking at the DNA profile, comparing the profile with the victim and suspect, and making sure the conclusions arrived at in the report are accurate, and checking submission dates and other administrative reviews—on four separate occasions prior to trial. 3 RR 160. She testified the tests show the sperm on Nash's vaginal swabs was consistent with Martin's DNA. 3 RR 152.

Under Texas Rule of Evidence 703, an expert witness is permitted to testify concerning the basis of her opinion relying on facts or data perceived or made known to her by others, regardless of her personal knowledge of that information. Such testimony may be based entirely on hearsay as long as it is of a type "reasonably relied upon" by other experts in the same field. Thus, the testimony in this case was properly admitted, as Rios was an expert witness—it does not matter if the basis of her opinion was facts or data made known to her by others, as the data is clearly of a type reasonably relied upon by experts in her field.

Furthermore, even if the testimony was admitted in error, Petitioner has shown no prejudice to himself as a result of Rios's testimony. He does not claim she was not a reliable expert or the test results were unreliable. In other words, he has not shown cross-examination of the chemist who prepared the report would have been of any use to him. The Fifth Circuit has echoed other circuits in finding "production of the chemist who performed the test rarely leads to any admissions helpful to the party." *Sherman v. Scott*, 62 F.3d 136, 142 (5th Cir. 1995) (quotations omitted). Thus, any erroneous admission of Rios's testimony did not deprive Petitioner of a fair trial, such that he is entitled to habeas relief on this ground.

**(4) Excited Utterance**

Petitioner objects to the trial court's allowing Officer Johnson to testify as to what Nash told him about the assault over defense counsel's hearsay objection. Pet.'s Memo. at Claim 4. The trial court allowed Officer Johnson's testimony under the excited utterance exception to the hearsay rule, as Officer Johnson testified that when he met Nash she was very upset, crying, and traumatized. 3 RR 69; 70-71. Consequently, the trial court allowed the State to question Officer Johnson about what Nash told him regarding the assault. 3 RR 70.

Rule 803(2) excludes from hearsay "a statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." TEX. R. EVID. 803(2). That the statement may be made hours or days after the event is a factor to be considered, but is not determinative. *Zuliani v. State*, 97 S.W.3d 589, 596 (Tex. Crim. App. 2003) (finding statement made 20 hours after incident to be an excited utterance); *Apolinar v. State*, 155 S.W.3d 184 (Tex. Crim. App. 2005) (finding statement made four days after incident to be an excited utterance where the speaker was heavily medicated, unconscious, or incoherent in the interim). Instead, the critical question is whether the declarant was dominated by the emotions, excitement, fear, or pain of the event or condition at the time of the statement. *Salazar v. State*, 38 S.W.3d 141, 154 (Tex. Crim. App. 2001). Factors the trial court may consider include the length of time between the occurrence and the statement, the nature of the declarant, whether the statement is made in response to a question, and whether the statement is self-serving. *Apolinar*, 155 S.W.3d at 187. In considering situations in which a considerable length of time has passed between the event and the statement, the *Apolinar* court opined

> A useful rule of thumb is that where the time interval between the event and the statement is long enough to permit reflective thought, the statement will be excluded in the absence of some proof that the declarant did not in fact engage in a reflective thought process. Testimony that the declarant still appeared "nervous" or "distraught" and that there was a reasonable basis for continuing emotional upset will often suffice.

*Id.* (quoting 2 John W. Strong, *McCormick on Evidence* § 272, at 207-08 (5th ed. 1999).

In the present case, the trial court was within the bounds of reason in deciding that Nash's statements to Officer Johnson, made the morning after the rape and while she was very upset, crying, and traumatized, were excited utterances. Although it is admittedly a close call whether Nash's statements fall within the excited utterance exception, admission of the testimony was clearly not unreasonable. Furthermore, the trial court's ruling—even if erroneous—was not an error so extreme that it constituted a denial of "fundamental fairness." *See Little*, 162 F.3d at 862. Officer Johnson's testimony as to Nash's recounting of the incident was redundant of Nash's own testimony about the incident, and therefore there is no reasonable probability the exclusion of it would have changed the outcome of the trial. *See Styron v. Johnson*, 262 F.3d 438, 454 (5th Cir. 2001) ("The test to determine whether trial error makes a trial fundamentally unfair is whether there is a reasonable probability that the verdict might have been different had the trial been properly conducted.").

**(5) Extraneous Offense Evidence**

Petitioner next argues one of the State's witnesses, Detective Travis of the Austin Police Department, testified he had contact with Petitioner on April 26, 1995—approximately three months prior to the aggravated sexual assault of Nash. Pet.'s Memo. at Claim 8. Petitioner claims Detective Travis testified he asked Petitioner to come down to APD headquarters to answer

questions, take photographs, give a statement, and provide bodily fluids for testing. *Id.* According to Petitioner, "[t]his testimony alerted the jury that they were investigating Petitioner for another sex crimes offense before the instant offense occurred." *Id.* Petitioner correctly notes that Detective Travis testified that at the time in question he was a Sergeant Investigator in the Sex Crimes Detail. 3 RR 130. Petitioner's counsel did not object to the testimony.

Detective Travis's testimony was offered to show Petitioner's photograph was taken the day Detective Travis made contact with Petitioner, and that on the following day Detective Travis took samples of Petitioner's saliva, blood, and hair. 3 RR 133; 136. Detective Travis testified Petitioner voluntarily agreed to come in and give the samples. 3 RR at 132; 136. Both sides took great care to avoid any implication that semen was taken (which in fact it was not), and semen was never mentioned. 3 RR at 134-35. Although the fact Detective Travis worked for the Sex Crimes Detail at the time he talked to Petitioner was mentioned in passing, Detective Travis clearly indicated he asked Petitioner to ***voluntarily*** come in and give hair, blood, and saliva samples, and that Petitioner complied with this request.

Thus, there was no clear implication from Detective Travis's testimony that Petitioner was suspected of another sexual crime before the Nash incident occurred. Furthermore, the testimony was never objected to in the trial court, and Petitioner has not alleged or shown any cause for this failure. Nevertheless, even considering the argument on its merits, Petitioner has not shown the testimony was erroneously admitted, nor has he shown any prejudice from its admission, as there is no clear indication Detective Travis's testimony was a critical factor in the trial or the jury's determination.

### b.      Prosecutorial Misconduct

The Court next turns to Petitioner's claims about the State's conduct at the trial.  Petitioner

claims the State's counsel erroneously (a) commented on his failure to testify and his right to remain

silent during closing argument (claim three); (b) admitted hearsay during closing argument that

Nash's account of events was corroborated by police testimony, thus bolstering the witness (claim

four); (c) argued outside the record during punishment (claim seven); (d) solicited inadmissible

character evidence from Nash (claim six); (e) introduced inadmissible extraneous offense evidence

(claim eight); and (f) offered testimony of DNA lab results through the DPS crime lab supervisor

in violation of hearsay (claim two).

### (1) Closing Argument

Petitioner argues the State's closing argument violated his right to due process as protected

by the Fourteenth Amendment.  The standard for granting habeas relief because of prosecutorial

misconduct is "the narrow one of due process, and not the broad exercise of supervisory power."

*Derden v. McNeel*, 978 F.2d 1453, 1460 (5th Cir. 1992).  "When a claim regarding the impropriety

of the prosecution's argument is framed as a violation of due process, the appropriate inquiry is not

whether the remarks were undesirable or even universally condemned but, rather, whether the

prosecution's comments so infected the trial with unfairness that there is a reasonable probability

that the result would have been different if the proceeding had been conducted properly."  *Jackson*

*v. Johnson*, 194 F.3d 641, 653 (5th Cir. 1999) (citing *Darden v. Wainwright*, 477 U.S. 168 (1986);

*Foy v. Donnelly*, 959 F.2d 1307 (5th Cir. 1992)).  In other words, for a prosecutor's comments to

be of constitutional magnitude, the comments must have been so prejudicial they rendered the trial

"fundamentally unfair" within the meaning of the Due Process Clause of the Fourteenth

Amendment. *Jones v. Butler*, 864 F.2d 348, 356 (5th Cir. 1988). The burden is on the habeas petitioner to show a reasonable probability that but for the objectionable remarks the result would have been different. *Nichols v. Scott*, 69 F.3d 1255, 1278 (5th Cir. 1995).

### i. Comment on Failure to Testify

First, Petitioner contends the prosecutor improperly commented on Petitioner's failure to testify at trial, in violation of the Fifth Amendment. At the beginning of defense counsel's closing argument, the following transpired:

> DEFENSE: May it please the Court, counsel, Robert [the Petitioner], members of the jury. Robert didn't testify. That was my decision. That decision was made –
>
> STATE: I object to that. It's always the defendant to make the decision to whether to testify or not. That's improper for defense counsel to say that's his decision.
>
> DEFENSE: I'm in charge of this case, Your Honor.
>
> STATE: It doesn't matter who's in charge of the case. The defendant can invoke that right.
>
> DEFENSE: Mr. Martin didn't testify –
>
> COURT: I'll sustain the objection.

4 RR 28.

The government may not comment on a defendant's decision not to testify. *See Doyle v. Ohio*, 426 U.S. 610, 617-18 (1976). But such a comment violates the Fifth Amendment only where the comment was "manifestly intended" to be a comment on the defendant's silence, or the comment was "of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify." *United States v. Wharton*, 320 F.3d 526, 538 (5th Cir. 2003) (quoting *United States v. Rocha*, 916 F.2d 219, 232 (5th Cir. 1990)). Courts apply the

doctrine of harmless error: a comment will not warrant reversal if, beyond a reasonable doubt, it did not contribute to the jury's verdict. *United States v. Moreno*, 185 F.3d 465, 475 (5th Cir. 1999).

In the present case, the prosecutor only made the comments in question when defense counsel specifically stated it had been his ***his*** decision not to have Petitioner testify (rather than Petitioner's own decision). Thus, the prosecutor's objection and commentary was invited by defense counsel's statement, which was misleading, as a defendant always has the ultimate power to decide whether to testify. The prosecutor objected properly, and his comments clearly were not manifestly intended to comment on the defendant's silence, nor were they "of such a character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify." He simply corrected an improper characterization of whose ultimate decision it is for a defendant not to testify. Furthermore, even if the prosecutor's commentary was improper, the comments must be taken in context—the fact that they were an "invited response" to the comments of the defense attorney weighs on their prejudicial value. *United States v. Young*, 470 U.S. 1, 10-12 (1985); *Darden v. Wainwright*, 477 U.S. 168, 182 (1986). In *Young*, the Supreme Court found that the prosecutor's comments, "although inappropriate and amounting to error, were not such as to undermine the fundamental fairness of the trial and contribute to a miscarriage of justice" when they were invited by defense counsel's comments. *Young*, 470 U.S. at 16. The same is true of this case.

### ii. Bolstering Witness Testimony

Petitioner also argues the State improperly bolstered witness testimony by introducing inadmissible hearsay statements—specifically, the victim's statements to Officer Johnson—during closing arguments. Petitioner argues those statements were not admissible under the excited

utterance exception. *See* Tex. R. Evid. 803(2). During the State's closing argument, the prosecutor stated:

> Ms. Nash's account of what happened to her on that night was corroborated . . . by her behavior the next morning with Commander Johnson. Remember he testified that she was upset, that she was crying, that she appeared to be traumatized by what had happened to her.

4 RR 19.

"Bolstering occurs when one party introduces evidence for the purpose of adding credence or weight to earlier unimpeached evidence offered by that same party." *Rousseau v. State*, 855 S.W.2d 666, 681 (Tex. Crim. App. 1993) (citing *Guerra v. State*, 771 S.W.2d 453, 474 (Tex. Crim. App. 1988)). In *Cohn v. State*, the Texas Court of Criminal Appeals defined bolstering as "any evidence the ***sole*** purpose of which is to convince the factfinder that a particular witness or source of evidence is worthy of credit," when the credibility of that witness or source has not been attacked. 849 S.W.2d 817m 819 (Tex. Crim. App. 1993) (emphasis in original).

In the present case, the prosecutor was not introducing hearsay into evidence, as the trial court had already determined Nash's statements to Officer Johnson were admissible testimony (a ruling this Court found was not erroneous). Thus, the prosecutor was merely providing a summation of evidence presented at trial, which falls well within the parameters of permissible jury argument. *See Jackson v. State*, 17 S.W.3d 664, 673 (Tex. Crim. App. 2000) (finding permissible jury argument includes: (1) summation of the evidence presented at trial; (2) reasonable deductions drawn from that evidence; (3) an answer to opposing counsel's argument; and (4) a plea for law enforcement). Because the prosecutor did not engage in improper bolstering, and because there is

no evidence his comments had a substantial or injurious effect or influence on the jury's ultimate verdict in light of the evidence presented at trial, this ground is without merit.

### iii.    Argument Outside of the Record

Petitioner also claims the State argued outside the record during its punishment phase closing arguments. Specifically, Petitioner asserts the State implied there were other rapes or crimes that were not proven to the jury.

Defense counsel stated during his closing argument at the punishment phase:

> I would ask you not to let this five-month period to define a man's whole life. And don't you know that if when he went back to West Virginia in 1995, and was there till they brought him here in '99, if he would have continued this aberrant behavior, if he would continued on his crack, that he would have had more witnesses here from the state testifying to the same type of thing. But we don't have that. So we got this one period of time. So I think that if you seriously look at the situation, this was just a really bad period. And I think if you look at it you would agree that it was the crack cocaine.

6 RR 64.

In rebuttal, during the State's closing, the prosecutor argued:

> Is anybody in here insane enough to believe that all of a sudden this started happening in March of 1995 and all of a sudden it stopped happening in August of 1995? Do you have any idea what courage it took for these women to come into court and hope that you would believe them?

6 RR 71.

Again, permissible closing argument must fall within the parameters of "(1) summation of the evidence presented at trial; (2) reasonable deductions drawn from that evidence; (3) an answer to opposing counsel's argument; and (4) a plea for law enforcement." *Jackson*, 17 S.W.3d at 673. The prosecutor's statement was a direct answer to defense counsel's argument that the five-month period in question was "just a really bad period" brought on by crack cocaine. Furthermore, the

-29-

implication that Petitioner may have been a habitual offender was a reasonable deduction from the evidence, which overwhelmingly showed the incident with Nash was not his only sexual offense. The prosecutor's argument, therefore, was permissible. Furthermore, there is no evidence the argument had a substantial and injurious effect or influence in determining the jury's verdict in light of the overwhelming evidence presented during the punishment phase of the trial.

### (2)    Character Evidence

Petitioner also asserts the State solicited irrelevant and inadmissible character evidence of the victim in violation of Rule 402 (because it was irrelevant) and Rule 608 (because it was improper character evidence) of the Texas Rules of Evidence. Specifically, he complains about testimony that was elicited during the State's case-in-chief about Nash's difficult childhood and how she was a foster child. 3 RR 13-14. The testimony on her background was extremely scant: she simply testified she went to foster care as an eight-year old because, in her understanding, "my mother and father didn't get along [and] Police was always at the house all the time." 3 RR 13. She stated she then got into Job Corps, and when she finished she decided to stay in Austin. 3 RR 14. Such was her entire testimony on her background with her family and her foster parents. The testimony was not objected to at trial.

The testimony in question is not improper character evidence in violation of Rule 608, as it does not attempt to show that Nash possessed any particular character trait for the purpose of showing the her credibility. *See* TEX. R. EVID. 608. For instance, the testimony did not help to establish that she has a truthful character; it was simply basic testimony on her background. The testimony also was admitted in violation of Rule 402: although they testimony may not have been highly relevant, it was not unreasonable to allow it. Thus, the prosecutor's conduct was not

improper. Morever, and most importantly, the Court finds there is absolutely no chance the prosecutor's conduct in eliciting the testimony had a substantial and injurious effect or influence in determining the jury's verdict.

### (3) Extraneous Offense Evidence

Petitioner claims the prosecutor improperly elicited testimony from Detective Travis which alerted the jury the police were investigating Petitioner for another sex crime approximately three months before the Petitioner sexually assaulted Nash. As discussed at length above, the Petitioner has entirely failed to show the testimony was improper, or that it had a substantial prejudicial effect on the jury's verdict.

### (4) DNA Testimony

Likewise, Petitioner claims the State offered hearsay testimony of the DNA lab results through the DPS crime lab supervisor, Rios. But, as explained above, Rios was an expert witness properly permitted to testify concerning the basis of her opinion relying on facts or data perceived by her or made known to her by others, regardless of her personal knowledge of that information. Accordingly, the prosecutor committed no misconduct in eliciting Rios's testimony.

### c.      Ineffective Assistance of Appellate Counsel

Petitioner claims he received ineffective assistance of appellate counsel because his appellate counsel filed an *Anders* brief on appeal. The Sixth Amendment to the United States Constitution guarantees a defendant reasonably effective assistance of counsel at all critical stages of a criminal proceeding. *Cuyler v. Sullivan*, 446 U.S. 335, 3344 (1980). Thus, an allegation of ineffective assistance of counsel is a cognizable basis for collateral review. *Massaro v. United States*, 538 U.S. 500, 509 (2003). To establish ineffective assistance of counsel, a petitioner must

allege and prove (1) his counsel's performance was deficient and (2) the deficient performance prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). The *Strickland* standard also applies to claims of ineffective assistance of appellate counsel. *Williams v. Collins*, 16 F.3d 626, 635 (5th Cir. 1994).

To establish the "deficient performance" prong, a petitioner must show his attorney's errors were "so serious that his counsel was not functioning as the 'counsel'" the Sixth Amendment guarantees. *Strickland*, 466 U.S. at 687. The attorney's conduct is reviewed with great deference, and there is a strong presumption that counsel has exercised reasonable professional judgment. *Lockhart v. McCotter*, 782 F.2d 1275, 1279 (5th Cir. 1986). To establish the "prejudice" prong, a petitioner must establish a reasonable probability that, "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A 'reasonable probability' is one sufficient to undermine confidence in the outcome of the proceeding." *Nixon v. Epps*, 405 F.3d 318, 324 (5th Cir. 2005) (citing *Koch v. Puckett*, 907 F.2d 524, 527 (5th Cir. 1990)). An attorney is not required to press frivolous points. *Koch*, 907 F.2d at 527. The Fifth Circuit has held that "a failure to establish ***either*** requirement [of the *Strickland* test] necessarily defeats the claim" of ineffective assistance of counsel. *Lincecum v. Collins*, 958 F.2d 1271, 1278 (5th Cir. 1992) (emphasis added).

In the present case, Petitioner's appellate counsel notified him by letter dated January 3, 2003 of her intention to file a motion to withdraw as the attorney of record. She also provided Petitioner a copy of the *Anders* brief she intended to file and explained to Petitioner he could file his own appellate brief. She indicated in her letter she had reviewed the record of Petitioner's case and found no arguable issues for direct appeal. However, in her letter she arguably misled

Petitioner into thinking he had to file an appellate brief before petitioning the higher court, and she did not specifically mention the term "discretionary review." For that reason, Petitioner was granted leave to file an out-of-time petition for discretionary review. *See Ex parte Martin*, Appl. No. 51,510-03.

The Magistrate Judge concluded Petitioner has not met the *Strickland* test for his ineffective assistance of counsel claim because did not identify any meritorious claims upon which he was likely to prevail on appeal. Rep. & Rec. at 28. In his objections, Petitioner argues he does present (in an exhibit to his memorandum) evidence a competent attorney found non-frivolous issues for appeal. Pet.'s Objs. at 10. Indeed, one attachment to Petitioner's memorandum is the petition for discretionary review filed by Alexandra Gauthier, an attorney, who states

> there were substantive issues that should have been raised by Petitioner's appellate attorney. It was wrong for the appellate attorney to file an *Anders* brief and moreover, the Court of Appeals should have recognized that there were issues that needed to be raised and briefed.

*See* Gauthier Letter at 13. Gauthier asserts the following grounds should have been raised for review: the erroneous admission of extraneous offense evidence, the erroneous admission of hearsay under the excited utterance exception (in Officer Johnson's testimony), the erroneous admission of hearsay under the medical diagnosis exception (in the SANE nurse's testimony), the erroneous admission of victim character evidence (in Nash's testimony), the erroneous admission of the DPS crime lab supervisor's testimony, the State's impermissible comment on Petitioner's failure to testify, and the prejudicial argument of the state in its punishment phase closing argument. *Id.* at 1-12.

Each of these grounds has been individually considered by this Court and found to be without merit. Therefore, appellate counsel cannot be found ineffective for having failed to raise these grounds, and prejudice cannot have resulted from counsel's failure to assert a meritless claim or make a meritless argument. *See United States v. Wilkes*, 20 F.3d 651, 653 (5th Cir.1994). Failure to raise meritless objections or grounds for appeal "is not ineffective lawyering; it is the very opposite." *Clark v. Collins*, 19 F.3d 959, 966 (5th Cir. 1994). Petitioner's claim therefore does not warrant habeas relief.

### d.     Infirmities in State Court Proceedings

Finally, Petitioner claims that on state writ, the trial court abused its discretion in entering findings of fact and conclusions of law and failing to rule on his motion for an evidentiary hearing. *See* Pet.'s Memo. at Claim 10. However, because "infirmities in state habeas proceedings are not proper grounds for federal habeas relief," *see Wheat v. Johnson*, 238 F.3d 357, 361 (5th Cir. 2001); *Nichols v. Scott*, 69 F.3d 1255, 1275 (5th Cir. 1995), this ground for relief must also be denied.

### CONCLUSION

Because Petitioner has raised no meritorious grounds for relief, the Court agrees with the Magistrate Judge his petition for writ of habeas corpus should be denied.

In accordance with the foregoing:

IT IS ORDERED that the Report and Recommendation of the Magistrate Judge [#27] is ACCEPTED.

IT IS FURTHER ORDERED that Petitioner Robert Lee Martin's Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2254 [#1] is DENIED.

IT IS FINALLY ORDERED that all remaining pending motions are DISMISSED

AS MOOT.

SIGNED this the 5th day of November 2009.


_____
SAM SPARKS
UNITED STATES DISTRICT JUDGE